FILED

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

2017 AUG -2 PM 3: 26

LAURA HILTON and DANIEL
METZGER, individually and on behalf of all
others similarly situated,

Case No.

**CLASS ACTION COMPLAINT**

*Plaintiffs,*

**DEMAND FOR JURY TRIAL**

*v.*

6:17-CV-1427-ORL-37-TBS.

EXPAND INCORPORATED dba GIGATS,
also dba SOFTROCK, INC., an Illinois
corporation,

*Defendant.*

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Laura Hilton ("Hilton" or "Plaintiff Hilton") and Plaintiff Daniel

Metzger ("Metzger" or "Plaintiff Metzger") bring this Class Action Complaint and

Demand for Jury Trial ("Complaint") against Defendant Expand Incorporated dba Gigats,

also dba Softrock, Inc. ("Gigats") to stop Defendant's practice of sending unsolicited text

messages to cellular telephones even after consumers request for such messages to stop

and to obtain redress for all persons injured by its conduct. Plaintiff Hilton and Plaintiff

Metzger, for their Complaint, allege as follows upon personal knowledge as to

themselves and their own acts and experiences, and, as to all other matters, upon

information and belief, including investigation conducted by their attorneys. Plaintiff

Hilton and Plaintiff Metzger will be collectively referred to herein as "Plaintiffs."

1

## NATURE OF THE ACTION

1.        Gigats created a job-matching program that can be utilized by any consumer seeking employment.  To use Gigats' program, the consumer sets his job preferences and Gigats sends to that consumer a customized job opportunity via his or her cellular telephone based on the set preferences.

2.        Unfortunately for consumers, Gigats casts its marketing net too wide. That is, in an attempt to promote its business, Gigats conducted (and continues to conduct) a wide-scale telemarketing campaign that features the sending of repeated unsolicited text messages to consumers' cellular telephones -- without consent, and to those on the National Do Not Call Registry -- all in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA").

### A. Bulk SMS Marketing

3.        In recent years, marketers who have felt stymied by federal laws limiting solicitation by telephone, fax machine, and e-mail have increasingly looked to alternative technologies through which to send bulk messages cheaply.

4.        Bulk text messaging, or SMS marketing, has emerged as a new and direct method of communicating and soliciting consumer business. The term "Short Message Service" or "SMS" is a messaging system that allows cellular telephone subscribers to use their cellular telephones to send and receive short text messages, usually limited to 160 characters. An SMS message is a text message call directed to a wireless device through the use of the telephone number assigned to the device.

5.        When an SMS message call is successfully made, the recipient's cell phone alerts him or her that a message has been received. As cellular telephones are

2

inherently mobile and are frequently carried on their owner's person, calls to cellular telephones, including SMS messages, may be received by the called party virtually anywhere worldwide and instantaneously.

### B. Defendant Transmits Text Messages to Consumers Who Do Not Want Them

6.      Defendant purports to offer to consumers customized job openings. Then, through itself and various affiliates, sends text messages to consumers' cellular telephones in an attempt to solicit business.

7.      Defendant sends text messages from "short code" 44154.[1] A short code is akin to a telephone number for text messages.

8.      Defendant also sends text messages from telephone numbers 559-258-5439; 857-263-3816; 717-219-5333; 585-310-0754; 228-200-0251; and 687-586-0882.[2]

9.      In sending these text messages, Defendant took no steps to acquire the oral or written prior express consent of Plaintiffs or the Class Members who received the unsolicited text messages.

10.     Defendant sent, or had sent on its behalf, the same (or substantially the same) text messages *en masse* to thousands of cellular telephone numbers throughout the United States.

11.     In sending the text messages at issue in this Complaint, Defendant utilized an automatic telephone dialing system ("ATDS"). Specifically, the hardware and software used by Defendant (or its agent) has the capacity to store, produce, and dial random or sequential numbers, and/or receive and store lists of telephone numbers, and to dial such numbers, *en masse,* in an automated fashion without human intervention.

---

1 This number is for illustrative purposes only and not one of limitation.
2 *Id.*

Defendant's ATDS includes features substantially similar to a predictive dialer, inasmuch as it is capable of making numerous text message calls simultaneously (all without human intervention).

12.   Defendant was and is aware that text messages were and are being made without the prior express written consent of the text message recipients.

## C. Defendant Transmits Text Messages to Consumers Who Have Expressly Opted-Out

13.   Defendant sends unauthorized text messages to cellular subscribers who have expressly "opted-out" or requested not to receive text messages. But, even if any prior consent existed, Defendant is required to honor each stop-request as a termination of any prior consent. Accordingly, any SMS text message (other than a final one-time confirmation text message confirming the recipient's desire to not receive such messages) sent to a cellular subscriber after receiving an express stop request is done without prior express consent.

14.   To help mobile marketers navigate regulatory compliance, the Mobile Marketing Association ("MMA") publishes specific guidelines based on accepted industry practices for all mobile marketers. Those guidelines include industry best practices for processing and honoring stop requests from consumers.

15.   According to the MMA's October 2012 U.S. Consumer Best Practices for Messaging, "[a] subscriber must be able to stop participating and receiving messages from any program by sending STOP to the short code used for that program. . . END, CANCEL, UNSUBSCRIBE or QUIT should also be opt-out key words for all programs; however content providers should feature the word STOP in their advertising and messaging. . . When sent, these words cancel the subscriber's previous opt-in for

messaging." Further, "[t]he content provider must record and store all opt-out

transactions."

16.     CTIA[3] similarly advises that standards for processing opt-out messages in

shortcode programs:

> Functioning opt-out mechanisms are crucial for all text messaging
> programs. Programs must always acknowledge and respect customers'
> requests to opt out of programs
> ...
> Short code programs must respond to, at a minimum, the universal
> keywords STOP, END, CANCEL, UNSUBSCRIBE, and QUIT by
> sending an opt-out message and, if the user is subscribed, by opting the
> user out of the program. Subsequent text, punctuation, capitalization, or
> some combination thereof must not interfere with opt-out keyword
> functionality.[4]

17.     CTIA additionally provides guidance on standards for notifying cellular

telephone users about their ability to opt-out of text message programs:

> Recurring-messages programs must also display opt-out instructions at
> program opt-in and at regular intervals in content or service messages, at
> least once per month. Opt-out information must be displayed on the
> advertisement. A program may deliver one final message to confirm a user
> has opted out successfully, but no additional messages may be sent after
> the user indicates a desire to cancel a short code program.[5]

18.     Again, Defendant simply ignores these accepted industry guidelines.

Instead, Defendant makes it difficult for consumers to opt-out or unsubscribe to its text

messages.

---

[3] The CTIA is an international non-profit organization that audits and enforces the rules
surrounding carrier-based text messaging programs. Together, the MMA and the CTIA
establish and publish guidelines setting forth accepted industry best practices for mobile
marketing.
[4] *See,* CTIA's Short Code Monitoring Program, *Short Code Monitoring Handbook,*
Version 1.6, effective July 16, 2016, page 4, available at
https://www.usshortcodes.com/info/static/docs/CTIA%20Short%20Code%20Monitoring
%20Handbook%20v1.5.2.pdf
[5] *Id.*

19.     Despite receiving numerous express stop requests from cellular subscribers, including Plaintiffs, Defendant continues to send automated text messages to these subscribers, sometimes for months or years afterwards.

20.     Defendant knows, or is reckless in not knowing, that its text messages to these cellular subscribers are unauthorized. Reply message stop requests are, by design, sent to Defendant's short code, thereby directly informing Defendant that any subsequent messages are unauthorized. Ultimately, consumers are forced to bear the costs of receiving these unsolicited and unauthorized text messages.

21.     Upon information and belief, and via investigation by Plaintiffs' attorneys, each of the text messages sent to Plaintiffs and the Classes are affiliated with Defendant.

22.     By sending the text messages at issue in this Complaint, Defendant caused Plaintiffs and the other members of the Classes actual harm and cognizable legal injury. This includes the aggravation and nuisance and invasions of privacy that result from the sending and receipt of such text messages, a loss of value realized for the monies consumers paid to their carriers for the receipt of such text messages, and a loss of the use and enjoyment of their phones, including wear and tear to the related data, memory, software, hardware, and battery components, among other harms.

23.     In response to Defendant's unlawful conduct, Plaintiffs filed this action seeking an injunction requiring Defendant to cease all unsolicited text messaging activities and an award of statutory damages to the members of the Classes under the TCPA, together with costs and reasonable attorneys' fees.

## PARTIES

24.     Plaintiff Laura Hilton is a natural person and resident of Reynoldsburg,
Ohio.

25.     Plaintiff Daniel Metzger is a natural person and resident of San Francisco,
California.

26.     Defendant Gigats is a corporation organized and existing under the laws of
the State of Illinois with a principal place of business located at 1701 Park Center Drive,
Orlando, Florida 32835.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action under 28
U.S.C. § 1331, as the action arises under the TCPA, which is a federal statute. This Court
has personal jurisdiction over Defendant because it conducts a significant amount of
business in this District, solicits consumers in this District, sends and continues to send
unsolicited text messages in this District, and because the wrongful conduct giving rise to
this case occurred in, was directed to, and/or emanated from this District.

28.     Venue is proper in this District under 28 U.S.C. § 1391(b) because
Defendant conducts a significant amount of business within this District and markets to
this District, and because the wrongful conduct giving rise to this case occurred in and/or
was directed to this District. Venue is additionally proper because Defendant resides in
this District.

## COMMON FACTUAL ALLEGATIONS

29.     As mentioned above, Gigats is a job-matching program utilized by a
consumer seeking employment.  The consumer sets his job preferences and Gigats sends

7

that person a customized job opportunity via their cellular telephone based on those preferences.

30.     In recent years, companies such as Defendant have turned to unsolicited telemarketing as a way to increase its customer base. Widespread telemarketing, often through third parties such as Defendant's affiliates is a major method by which Defendant recruits new customers.

31.     At all times material to this Complaint Defendant was and is fully aware that unsolicited telemarketing text messages are being sent to consumers' cellular telephones through their own efforts and/or their agents.

32.     Defendant, through itself or various affiliates, knowingly sent (and continues to send) unsolicited telemarketing text messages without the prior express written consent of the recipients and knowingly continued to text message them after requests to stop. In so doing, Defendant not only invaded the personal privacy of Plaintiffs and members of the putative Classes, but also intentionally and repeatedly violated the TCPA.

## FACTS SPECIFIC TO PLAINTIFF LAURA HILTON

33.     On May 13, 2010, Plaintiff Hilton registered her cellular telephone number on the National Do Not Call Registry to avoid receiving unsolicited telemarketing calls on her cellular telephone.

34.     Beginning on or around March 30, 2017, and more than 30 days after she registered her cellular telephone number on the National Do Not Call Registry, Plaintiff Hilton began receiving unsolicited text messages on her cellular telephone from telephone number 559-258-5439; 585-310-0754; 228-200-0251; and 678-586-0882.

35.     Telephone numbers 559-258-5439; 585-310-0754; 228-200-0251; and 678-586-0882 are owned and/or otherwise controlled by Gigats, or a third party on its behalf.

36.     On March 30, 2017 at 1:47 p.m., Plaintiff Hilton received a text message from telephone number 559-258-5439 stating, "If you still want the position at Geometry Global go to http://readyinterview.com/501CE3DB and use Ayanna Guthrie to apply. Txt STOP to optout." The hyperlink in the March 30, 2017 text message, http://readyinterview.com/501CE3DB, pointed to http://www.employmentselect.com, before being redirected to http://www.myjoblist.com, which are both websites owned and/or otherwise controlled by Gigats.

37.     A screenshot image of the March 30, 2017 text message is reproduced below:



38.     On March 31, 2017, Plaintiff Hilton received another text from telephone number 585-310-0754 stating, "If you still want the position at AtriCure go to http://readyinterview.com/F10675CE and use Ayanna Guthrie to apply. Txt STOP to optout[.]" The hyperlink in the March 31, 2017 text message, http://readyinterview.com/F10675CE, pointed to http://www.employmentselect.com, before being redirected to http://www.myjoblist.com, which are both websites owned and/or otherwise controlled by Gigats.

39.     A screenshot image of the March 31, 2017 text message is reproduced below:



40.     On April 2, 2017, Plaintiff Hilton received another text from telephone number 228-200-0251 stating, "Hi Ayanna, I wanted to follow up re: the job opening with Shire. You can view here http://jobssafe.com/2E15DEEB Txt STOP to optout[.]" The hyperlink in the April 2, 2017 text message, http://jobssafe.com/2E15DEEB, pointed to http://www.employmentselect.com, before being redirected to

http://www.myjoblist.com, which are both websites owned and/or otherwise controlled by Gigats.

41.     A screenshot image of the April 2, 2017 text message is reproduced below:



42.     On April 4, 2017, Plaintiff Hilton received another text from telephone number 678-586-0882 stating, "Ayanna, If you want to the job with AtriCure you should reach out to them today. Go to http://jobgrabs.com/2673B1D8 LMK, ok? Txt STOP to optout[.]" The hyperlink in the April 4, 2017 text message, http://jobgrabs.com/2673B1D8, pointed to http://www.employmentselect.com, before being redirected to http://www.myjoblist.com, which are both websites owned and/or otherwise controlled by Gigats.

43.     A screenshot image of the April 4, 2017 text message is reproduced

below:



44.     Plaintiff Hilton does not know or is not familiar with anyone named

Ayanna Guthrie.

**FACTS SPECIFIC TO PLAINTIFF DANIEL METZGER**

45.     Similarly to Plaintiff Hilton, beginning on or around March of 2017,

Metzger began receiving unsolicited text messages on his cellular telephone from SMS

shortcode 44154 and telephone numbers 857-263-3816 and 717-219-5333, which all both

associated with Gigats and/or its agents.

46.     On March 28, 2017 at 2:18 p.m., Plaintiff Metzger received a text message

from SMS shortcode 44154 stating, "Hi alex, just following up about the job opening

with Genentech.  If interested view at http://mycityjobs.org/ED3BE91B Txt STOP to

optout[.]"  The hyperlink in the March 28, 2017 text message,

http://mycityjobs.org/ED3BE91B, pointed to http://www.employmentselect.com, before

being redirected to http://www.myjoblist.com, which are both websites owned and/or otherwise controlled by Gigats.

47.     For the sole purpose of getting the unwanted text messages to stop, Plaintiff Metzger replied, "This isn't Alex." His reply was followed by a message from Gigats, which read, "To stop last sender from sending you messages please reply STOP."

48.     Accordingly, Plaintiff Metzger replied, "STOP."

49.     A screenshot image of the March 28, 2017 text message is reproduced below:



50.     However, despite Plaintiff Metzger's request for Gigats' text messages to stop, Gigats sent Plaintiff Metzger at two more text messages.

51.     On March 29, 2017 at 12:17 p.m., Plaintiff Metzger a text message from telephone number 857-263-3816 stating, "alex, if you're still seeking a new Gig I think you'll like this one - make sure you check out the pay http://omg-talent.com/36C34F18 Txt STOP to optout[.]" The hyperlink in the March 29, 2017 text message, http://omg-talent.com/36C34F18, pointed to http://www.employmentselect.com, before being

13

redirected to http://www.myjoblist.com, which are both websites owned and/or otherwise controlled by Gigats.

52.     A screenshot image of the March 29, 2017 text message is reproduced below:



53.     On March 30, 2017, Plaintiff Metzger received another unwanted text message from telephone number 717-219-5333 stating, "alex, if you want the job with Hallmark Aviation you should reach out to them today. Go to http://ptajobsite.com/C8C5652E LMK, ok? Txt STOP to optout[.]"  The hyperlink in the March 30, 2017 text message, http://ptajobsite.com/C8C5652E, pointed to http://www.employmentselect.com, before being redirected to http://www.myjoblist.com, which are both websites owned and/or otherwise controlled by Gigats.

54.     A screenshot image of the March 30, 2017 text message is reproduced below:



55.     Neither Plaintiff Hilton nor Plaintiff Metzger have a relationship with Defendant, have never provided their telephone numbers directly to Defendant, or requested that Defendant send text messages to them. Simply put, Plaintiffs have never provided their prior express consent to Defendant to send text messages to them and have no business relationship with Defendant.

56.     By sending unauthorized text messages as alleged herein, Defendant has caused consumers actual harm in the form of annoyance, nuisance, and invasion of privacy. In addition, the calls disturbed Plaintiffs' use and enjoyment of their cellular telephones, in addition to the wear and tear on the cellular telephone's hardware (including the cellular telephone's battery) and the consumption of memory on their cellular telephones. In the present case, a consumer could be subjected to many unsolicited text messages as Defendant does not provide instructions or a mechanism to opt out, or simply ignores opt out requests that it receives.

57.     In order to redress these injuries, Plaintiffs, on behalf of themselves and the Classes of similarly situated individuals, bring suit under the Telephone Consumer

Protection Act, 47 U.S.C. § 227, *et seq.*, which prohibits unsolicited voice and text messages to cellular telephones.

58.     On behalf of the Classes, Plaintiffs seek an injunction requiring Defendant to cease all illegal text-messaging activities and an award of statutory damages to the Class members, together with costs and reasonable attorneys' fees.

## CLASS ALLEGATIONS

59.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of themselves and all others similarly situated and seek certification of the following three Classes:

> **Autodialed No Consent Class:** All persons in the United States who from a date four years prior to the filing of the initial complaint in this case through the present: (1) Defendant (or a third person acting on behalf of Defendant) sent text messages, (2) to the person's cellular telephone number, and (3) for whom Defendant claims it obtained prior express written consent in the same manner as Defendant claims it supposedly obtained prior express written consent to send automated text messages to the Plaintiffs.

> **Autodialed Stop Call Class:** All persons in the United States who from a date four years prior to the filing of the initial complaint in this case through the present: (1) Defendant (or a third person acting on behalf of Defendant) sent text messages, (2) on the person's cellular telephone number, and (3) for the purpose of promoting a business or service, (4) after the person informed Defendant to stop sending them text messages.

> **No Consent DNC Class:** All individuals in the United States (1) who had his or her telephone number(s) registered with the National Do Not Call Registry for at least thirty days, (2) who thereafter received more than one telephone call made by or on behalf of Defendant within a 12-month period starting February 12, 2012 to the present, and (3) for whom Defendant obtained prior express consent to call in the same manner as Defendant claims it obtained prior express consent to call the Plaintiff Hilton.

60.     The following individuals are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, its subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) Plaintiffs' attorneys; (4) persons who properly execute and file a timely request for exclusion from the Classes; (5) the legal representatives, successors or assigns of any such excluded persons; and (6) persons whose claims against Defendant have been fully and finally adjudicated and/or released. Plaintiffs anticipate the need to amend the Class definitions following appropriate discovery.

61.     **Numerosity**: The exact sizes of the Classes are unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendant sent autodialed text messages to thousands of consumers who fall into the definition of the Classes. Members of the Classes can be easily identified through Defendant's records.

62.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

(a) whether Defendant's conduct constitutes a violation of the TCPA;

(b) whether Defendant utilized an automatic telephone dialing system to send text messages to members of the Classes;

(c) whether members of the Classes are entitled to statutory and treble damages based on the willfulness of Defendant's conduct;

(d) whether Defendant systematically sent multiple text messages to consumers whose telephone numbers were registered with the National

Do Not Call Registry and whether the text messages were made to such persons after they requested to no longer be contacted;

(e) whether Defendant obtained prior express written consent to contact any class members; and

(f) whether Defendant continued to send text messages after consumers communicated an opt-out.

63. **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Classes.

64. **Appropriateness:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes and as wholes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final class-wide injunctive relief appropriate. Defendant's business practices apply to and affect the members of the Classes uniformly, and Plaintiffs' challenge of those practices hinges on Defendant's conduct with respect to the Classes as wholes, not on facts or law applicable only to Plaintiffs. Additionally, the damages suffered by individual members of the Classes will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the members of the Classes to obtain effective relief from Defendant's misconduct on an individual basis. A class action provides the benefits of

single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

### FIRST CAUSE OF ACTION
**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiffs the Autodialed No Consent Class)**

65.     Plaintiffs repeat and reallege the above paragraphs of this Complaint and incorporates them herein by reference.

66.     Defendant sent autodialed text messages to cellular telephone numbers belonging to Plaintiffs and other members of the Autodialed No Consent Class without first obtaining prior express consent to receive such autodialed text messages.

67.     Defendant sent the text autodialed text messages using equipment that had the capacity to store or produce telephone numbers using a random or sequential number generator, to receive and store lists of phone numbers, and to dial such numbers, *en masse*, without human intervention. The telephone dialing equipment utilized by Defendant, also known as a predictive dialer, dialed numbers from a list, or dialed numbers from a database of telephone numbers, in an automatic and systematic manner. Defendant's autodialer disseminated information *en masse* to Plaintiffs and other consumers.

68.     By sending the unsolicited text messages to Plaintiffs and the cellular telephones of members of the Autodialed No Consent Class without their prior express consent, and by utilizing an automatic telephone dialing system to make those calls, Defendant violated 47 U.S.C. § 227(b)(1)(A)(iii).

69.     Defendant has, therefore, violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of Defendant's conduct, Plaintiffs and the other members of the Autodialed No Consent Class are each entitled to, under 47 U.S.C. § 227(b)(3)(B), a minimum of $500.00 in damages for each violation of such act.

70.     In the event that the Court determines that Defendant's conduct was willful and knowing, it may, under 47 U.S.C. § 227(b)(3)(C), treble the amount of statutory damages recoverable by Plaintiffs and the other members of the Autodialed No Consent Class.

## SECOND CAUSE OF ACTION
### Telephone Consumer Protection Act
### (Violations of 47 U.S.C. § 227)
### (On Behalf of Plaintiff Metzger and the Autodialed Stop Call Class)

71.     Plaintiff Metzger repeats and realleges the above paragraphs of this Complaint and incorporates them herein by reference.

72.     Defendant and/or its agent transmitted unsolicited text message calls to cellular telephone numbers belonging to Plaintiff Metzger and the other members of the Autodialed Stop Call Class using equipment that, upon information and belief, had the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and/or receive and store lists of phone numbers, and to dial such numbers, *en masse*, without human intervention.

73.     The telephone dialing equipment utilized by Defendant and/or its agents, which is substantially similar to a predictive dialer, dialed numbers from a list, or dialed numbers form a database of telephone numbers, in an automatic and systematic manner.

74.     These text messages were made *en masse* and without the consent of the Plaintiff Metzger and the other members of the Autodialed Stop Call Class to receive

such wireless spam. Indeed, consent had been revoked by everyone since they each had responded with the common SMS codes to opt-out of further communications, such as "STOP," "REMOVE," "OPT OUT." or "CANCEL."

75.     Plaintiff Metzger and members of the Autodialed Stop Call Class expressly requested that Defendant no longer sends text messages to them, after which Defendant failed to place Plaintiff Metzger and members of the Autodialed Stop Call Class on Defendant's internal do-not-call list (or failed to do so within a reasonable time period).

76.     The text messages to Plaintiff Metzger and the Autodialed Stop Call Class were made after any consent had been expressly revoked by responding with an opt-out request, such as "STOP." This alone violates the TCPA.

77.     Additionally, Defendant's supposed opt out mechanism isn't cost free. Among other things, it requires the transmission of data from the user's cellular telephone that results in a reduction of the user's allowable data.

78.     Based on such conduct, Defendant has violated 47 U.S.C. § 227(b)(1)(A)(iii).

79.     Defendant violated 47 C.F.R. § 64.1200 (d) by initiating calls for telemarketing purposes to residential and wireless telephone subscribers, such as Plaintiff Metzger and the Autodialed Stop Call Class, without instituting procedures that comply with the regulatory minimum standards for maintaining a list of persons who request not to receive telemarketing calls from them.

80. As a result of such conduct, Plaintiff Metzger and the other members of the Autodialed Stop Call Class are each entitled to, under 47 U.S.C. § 227(b)(3)(B), a minimum of $500.00 in damages for each violation of such act.

81. In the event that the Court determines that Defendant's conduct was willful and knowing, it may, under 47 U.S.C. § 227(b)(3)(C), treble the amount of statutory damages recoverable by Plaintiff Metzger and the other members of the Autodialed Stop Call Class.

## THIRD CAUSE OF ACTION
### Violation of 47 U.S.C. § 227, et seq.
### (On behalf of Plaintiff Hilton and the No Consent DNC Class)

82. Plaintiff Hilton incorporates the foregoing factual allegations as if fully set forth herein.

83. 47 U.S.C. §227(c) provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object.

84. The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

85. 47 C.F.R. § 64.1200(d) further provides that "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless

22

such person or entity has instituted procedures for maintaining a list of persons who

request not to receive telemarketing calls made by or on behalf of that person or entity.

The procedures instituted must meet the following minimum standards:

> (1) Written policy. Persons or entitles making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

> (2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

> (3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request . . . .

> (4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

> (5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

> (6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made."

86.     Defendant violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to residential telephone subscribers such as Plaintiff Hilton and the No Consent DNC Class members who registered their respective telephone numbers on the National Do Not Call Registry. These consumers requested to not receive calls from Defendant as set forth in 47 C.F.R. § 64.1200(d)(3).

87.     Defendant made more than one unsolicited telephone call to Plaintiff Hilton within a 12-month period without Plaintiff Hiton's prior express consent to receive such calls. Defendant also made more than one unsolicited telephone call to each member of the Class within a 12-month period without their prior express consent to receive such calls. Plaintiff Hilton and members of the No Consent DNC Class never provided any form of consent to receive telephone calls from Defendant, oral or written, and/or Defendant does not have a current record of consent to place telemarketing calls to them. Defendant violated 47 U.S.C. § 227(c)(5) because Plaintiff Hilton and the No Consent DNC Class received more than one telephone calls in a 12-month period made by or on behalf of Defendant in violation of 47 C.F.R. § 64.1200, as described above.

88.     Defendant violated 47 C.F.R. § 64.1200(d) by initiating calls for telemarketing purposes to residential telephone subscribers, such as Plaintiff and the No Consent DNC Class, without instituting procedures that comply with the regulatory minimum standards for maintaining a list of persons who request not to receive telemarketing calls from them, and by not informing and training its personnel engaged in any aspect of telemarketing in the existence and use of the do-not-call list.

89.     As a result of Defendant's unlawful conduct, Plaintiff Hilton and the DNC No Consent Class suffered actual damages and, under section 47 U.S.C. § 227(c),

Plaintiff Hilton and each member of the No Consent DNC Class are each entitled to receive up to $500 in damages for each violation of 47 C.F.R. § 64.1200.

90.    In the event that the Court determines that Defendant's conduct was willful and knowing, the Court may, pursuant to Section 227(b)(3), treble the amount of statutory damages recoverable by Plaintiff Hilton and the other members of the No Consent DNC Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes, pray for the following relief:

91.    An order certifying the Classes as defined above, appointing Plaintiffs Laura Hilton and Daniel Metzger as the representatives of the Classes, and appointing their counsel as Class Counsel;

92.    An award of actual monetary loss from such violations or the sum of five hundred dollars ($500.00) for each violation, whichever is greater all to be paid into a common fund for the benefit of the Plaintiffs and the Class Members;

93.    An order declaring that Defendant's actions, as set out above, violate the TCPA;

94.    A declaratory judgment that Defendant's telephone calling equipment constitutes an automatic telephone dialing system under the TCPA;

95.    An order requiring Defendant to disgorge any ill-gotten funds acquired as a result of its unlawful telephone calling practices;

96.     An order requiring Defendant to identify any third-party involved in the autodialed calling as set out above, as well as the terms of any contract or compensation arrangement it has with such third parties;

97.     An injunction requiring Defendant to cease all unsolicited autodialed calling activities, and otherwise protecting the interests of the Classes;

98.     An injunction prohibiting Defendant from using, or contracting the use of, an automatic telephone dialing system without obtaining, and maintaining records of, call recipient's prior express written consent to receive calls made with such equipment;

99.     An injunction prohibiting Defendant from contracting with any third-party for marketing purposes until they establish and implement policies and procedures for ensuring the third-party's compliance with the TCPA;

100.    An injunction prohibiting Defendant from conducting any future telemarketing activities until they have established an internal Do Not Call List as required by the TCPA;

101.    An award of reasonable attorneys' fees and costs to be paid out of the common fund prayed for above; and

102.    Such other and further relief that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**LAURA HILTON and DANIEL METZGER**, individually and on behalf of Classes of similarly situated individuals

Dated: July 17, 2017               By: _/s/Stefan Coleman_____

26

One of Plaintiffs' Attorneys

Stefan Coleman (Florida Bar No. 0030188)
law@stefancoleman.com
LAW OFFICES OF STEFAN COLEMAN, P.A.
201 S. Biscayne Blvd., 28th floor
Miami, Florida 33131
Telephone: (877) 333-9427
Facsimile: (888) 498-8946

Blake J. Dugger*
blake@stefancoleman.com
LAW OFFICES OF STEFAN COLEMAN, P.A.
1011 W. Colter St., #236
Phoenix, Arizona 85013
Telephone: (602) 441-3704
Facsimile: (888) 498-8946

Attorney for Plaintiffs and the Classes

*pro hac vice pending